IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KEVIN B. SMITH,

                  Plaintiff,

                                      Civ. Action No.
                                      5:05-CV-0487 (DEP)

      vs.

TERRY BOYER, *et al.*,

                  Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

ALEXANDER & CATALANO, LLC      JAMES L. DONIGAN, ESQ.
115 E. Jefferson St., Suite 403
Syracuse, NY 13202

FOR DEFENDANTS:

ROEMER, WALLENS LAW FIRM      MATTHEW J. KELLY, ESQ.
13 Columbia Circle
Albany, NY 12203

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

_____Asserting diversity of citizenship as a basis for this court's subject

matter jurisdiction, plaintiff Kevin B. Smith, a New York resident, has

commenced this action to recover damages resulting from a motor vehicle

accident which occurred in June of 2003 in Pennsylvania.  Defendants, all citizens of Pennsylvania for diversity purposes, have conceded liability for negligence but dispute plaintiff's entitlement to recover damages, both economic and for pain and suffering.  Defendants' opposition to plaintiff's damage claim is based partly upon their contention that under New York's no-fault insurance regime, which they contend should apply, Smith's entitlement to recover damages is limited since he did not suffer from a serious injury as a result of the accident.

A non-jury trial was conducted by me in connection with this action, beginning on June 12, 2006.[1]  This decision sets forth my findings of fact and conclusions of law, based upon the evidence adduced during that trial.[2]

I.      BACKGROUND

---

[1]      The parties have consented to my jurisdiction to address dispositive aspects of the case, pursuant to 28 U.S.C. § 636(c).  *See* Dkt. No. 24.

[2]      The court's review of this matter was significantly hampered by virtue of the fact that rather than culling out and separately marking as exhibits any truly relevant documents, the parties instead marked and stipulated into evidence wholesale compilations of records including, by way of example, all of the records subpoenaed from one of plaintiff's treating physicians (Exhibit P-8), plaintiff's entire workers' compensation file (Exhibit D-A), and all of plaintiff's employment records from the company where he worked prior to his accident (Exhibit P-1).  The situation was compounded by the failure of the parties to provide, at the time of trial, complete listings and copies of their respective proposed exhibits, as required in the court's Uniform Pretrial Scheduling Order.

Plaintiff was born on June 17, 1963; at the time of trial, he was forty-two years old.  Smith is divorced, and resides in Williamstown, New York with his six children, of which he has had custody since December of 2003.  Plaintiff's children range in age from nine to eighteen; the oldest two of those children suffer from cystic fibrosis.

Plaintiff is a high school graduate, having achieved a local, non-regents diploma in 1982.  After graduating from high school plaintiff worked in a variety of positions, and for a period of time was a member of the United States Military Service.  In 1991 plaintiff trained to be a truck driver, ultimately receiving his commercial driver's license.

After working for approximately three years as a driver for another company, plaintiff became employed with G&C Food Distributors & Brokers, Inc. ("G&C"), headquartered in Syracuse, New York, in June of 1994.  Plaintiff's responsibilities at G&C included working as an over-the-road truck driver, making deliveries of product to G&C customers.  Some of the work performed by Smith at G&C was described by him as "hands on", meaning that he was required to load and offload products, sometimes utilizing a hand cart or pallet jack.  According to his payroll records, Smith was earning $14.70 per hour at G&C in 2003.

On June 18, 2003, while driving a Philadelphia route for G&C which entailed delivery stops in both Pennsylvania and New Jersey, the rear of plaintiff's truck was struck by a bus owned by defendant Bieber Tourways and/or Carl R. Bieber, and operated by Terry Boyer; all of those parties are domiciled in Pennsylvania, and were in June of 2003.  At the time of the accident, which occurred on Interstate 476 near the junction of that highway with Interstate 76, plaintiff's vehicle was stopped in traffic in the left lane, with its four-way emergency flashers operating.  As a result of the impact the rear end and "ICC bar" of plaintiff's truck were pushed in, and the cargo door was not properly operational.  The accident also caused plaintiff's trailer to buckle, and the back of his driver's seat to "lay flat."

After speaking with law enforcement officials regarding the accident, and declining an offer for transport by ambulance to a local emergency room, Smith continued driving his route, making one last stop and returning to Syracuse.[3]  As he made the return trip to Syracuse, without the benefit of a seat back, plaintiff noticed some initial soreness.  After returning to his home that evening plaintiff took Tylenol and went to bed,

---

[3]      After the accident plaintiff was able to access the contents of his truck only by using a forklift to force open the cargo door.

4

experiencing continued pain.

When plaintiff awoke on the morning after the accident, he was unable to move.  As a result Smith made an appointment with his general medical practitioner, Dr. Mufhta Kadura, who examined him on June 20, 2003 and arranged for x-rays and a CT scan of his cervical spine region. Results of x-rays taken on that same day were principally unremarkable, revealing, *inter alia*, "no encroachment on the neural foramen."  Reports of the CT scan testing revealed "[m]ulti-degenerative ostephyte formation" including a "small left posteriolateral ostephyte" at the C3-C4 level, a "small right posteriolateral ostephyte" at the C4-C5 level, and a "moderate sized right posteriolateral ostephyte . . . resulting in mild right lateral recess and neural foraminal compromise" at the C5-C6 level.  Based upon those results and his examination, on June 24, 2003 Dr. Kadura directed that the plaintiff remain out of work for a period of two weeks, and prescribed a course of physical therapy twice weekly; that therapy regimen commenced on June 30, 2003, and was extended for approximately four weeks through July of 2003, with little if any appreciable benefit to the plaintiff.[4]

---

[4]      As a result of an office visit on July 10, 2003 Dr. Kadura later recommended that the plaintiff refrain from working until August 2, 2003.

After remaining out of work based upon Dr. Kadura's advice and his continued experiencing of ongoing pain and numbness extending down his arm into his fingers, plaintiff attempted to return to work in mid-August and was assigned a local delivery run to Rochester, New York. While plaintiff had hoped to keep working, as a matter of financial necessity, he encountered ongoing physical difficulties, requiring him to once again go out on sick leave after working for approximately two weeks.[5,6]

Plaintiff was again cleared for work by Dr. Kadura on September 12, 2003, without limitation. Smith subsequently returned to G&C, logging 29.25 hours in the pay period ending on September 19, 2003, and 21.75 hours during the next week. At the end of that second period, however, plaintiff experienced difficulties on a Pennsylvania run which he was scheduled to make along with another G&C driver. After leaving G&C for the assigned run, plaintiff requested that the driver stop and leave him off in Tully, just south of Syracuse. A G&C dispatcher was subsequently sent to pick Smith up and return him to the company's offices. Plaintiff left

---

[5] According to his payroll records, Smith worked for a total of 22.25 hours during the pay period ending August 29, 2003.

[6] Smith presented at the Oneida Healthcare Center emergency room on August 19, 2003, complaining that he was experiencing neck pain as a result of having driven a truck the day before.

work following that unsuccessful run, and has not returned to G&C since.

Continued complaints of pain, numbness and tingling led to a referral of the plaintiff by Dr. Kadura to Dr. David Eng, a neurosurgeon practicing in Syracuse, New York.  Plaintiff was initially seen by Dr. Eng on October 1, 2003.  During that visit plaintiff did not appear to be in acute distress.  Dr. Eng's notes reflect that plaintiff's reflexes were symmetric, as was his strength throughout with the exception of his left triceps and biceps, which were found to be mildly impaired.  Dr. Eng also found that Smith exhibited "good range of motion in his neck", although he appeared to experience some difficulty in flexion.  As a result of his examination and findings Dr. Eng discerned the presence of cervical spondylosis with left side radiculopathy at the C6-C7 level, and recommended that Smith undergo magnetic resonance imaging ("MRI") testing.

Smith underwent a second round of x-ray and CT scan testing in early October 2003.  X-rays of plaintiff's cervical spine taken at that time reflected no evidence of fracture or dislocation, and no encroachment on the neural foramen.  A CT scan of plaintiff's cervical spine revealed normal alignment, with no evidence of disc bulging or herniation, although multi-level degenerative ostephyte formation was perceived posturally and

laterally at the C3-C4, C4-C5, and C5-C6 levels.  That CT testing also reflected mild right lateral recess and right neural foramen narrowing at the C5-C6 level as a result of an ostephyte ridge formation there.

Plaintiff's MRI testing, conducted on October 15, 2003, revealed a small spondylotic protrusion at the C3-C4 level, with mild narrowing of the margin of plaintiff's left foramina at that level, as well as a small herniation at the C6-C7 level and corresponding marked narrowing of the right anterior subarachnoid space at that level, and with a resulting slight displacement of the cervical cord and narrowing of the right lateral recess at that level.  According to Dr. Eng the spondylotic protrusion, referred to as a bone spur, is the result of a degenerative condition, described as part of the normal aging process.  Dr. Eng has characterized the bone spur as a latent condition whose existence predated the June 18, 2003 accident, noting that plaintiff was asymptomatic until the accident triggered nerve impingement.

During a follow-up visit to Dr. Eng on November 3, 2003, plaintiff complained of ongoing pain to his left shoulder, deltoids and biceps, with no improvement since the October visit.  As a result of that visit Dr. Eng refocused his attention from the C6-C7 level to C3-C4, and recommended

8

surgery to address the bone spur and Smith's reported symptomology.

Plaintiff thereafter underwent anterior cervical discectomy surgery, with

fusion and plating, at the C3-C4 level on January 16, 2004.  Notes of

subsequent visits with Dr. Eng reveal that after his surgery plaintiff

experienced some improvement, including in mobility.  By March 8, 2004

plaintiff reported that his pain and numbness in the left arm "ha[d] virtually

gone away."  Testing on that date reflected that plaintiff's strength was

symmetric, and his range of motion was good.

During an office visit with Dr. Eng on June 7, 2004 plaintiff reported

that he had recently recommenced physical therapy, and that he was

experiencing discomfort in the fourth and fifth digits.  Dr. Eng's

examination of Smith on that date revealed that his strength was

symmetric, with some weakness of the abductors and grip in the left bicep

and tricep regions.   Dr. Eng recommended an electromyography ("EMG")

and nerve conduction testing studies on the left side to further explore

plaintiff's symptoms, and continued him on physical therapy.  An EMG and

nerve conduction study subsequently conducted in or about August of

2004 revealed no ulnar dysfunction or other abnormalities.  Plaintiff

reiterated complaints of numbness and tingling in the fourth and fifth digits

of his left hand during a subsequent office visit to Dr. Eng on August 30, 2004.

On September 21, 2004 plaintiff's physical therapist prepared a functional capacity evaluation ("FCE") report assessing his limitations, based upon the therapist's testing.  In that FCE the therapist determined that plaintiff was unable to lift more than twenty pounds, or to elevate his arms above his shoulders or neck.  Relying upon that FCE, Dr. Eng concluded on October 4, 2004 that plaintiff should not drive a truck, and instead could only return to light duty work.  Plaintiff was subsequently cleared by Dr. Eng on November 2, 2004 to return to work, effective November 15, 2004.  Unfortunately, however, plaintiff's employer was either unable or unwilling to accommodate plaintiff's circumstances, and advised Smith that the company did not have any light duty positions available for him.[7]

In June of 2005 additional x-rays were taken of plaintiff's cervical spine.  Those x-rays revealed no evidence of instability in flexion and

---

[7]       It is not entirely clear that plaintiff's restrictions were the sole basis for G&C's failure to return Smith to work.  During his testimony plaintiff acknowledged that he was not necessarily a model employee while at G&C, and had in the past had disputes with other company employees, including its safety officer.  Smith's personnel records confirm that he was issued written disciplinary warnings on several occasions, including for having engaged in arguments with other workers at G&C.

extension views, and satisfactory alignment of the cervical spine.  Based

upon plaintiff's ongoing complaints of pain and limitation and range of

motion, during an office visit on June 6, 2005 Dr. Eng recommended that

he undergo a second EMG and another round of MRI testing.  Plaintiff

failed to submit to either examination, however, complaining of the pain

which he experienced during earlier testing.

Aside from the two brief, failed efforts to return to G&C, plaintiff has

not worked as a truck driver since the June, 2003 accident.  Beginning on

or about December 18, 2004, and extending throughout 2005 and into

2006, Smith was employed as a day laborer supervisor with One Source,

a company engaged by contract to perform cleaning services at the

Syracuse University Carrier Dome, particularly after events held in the

facility.  In that position, which was secured through an acquaintance,

plaintiff was paid at an hourly rate which began at $6.50, but later

increased to $8.25, and often worked for periods ranging up to eighteen

hours in a single shift and twenty-nine hours over the course of a two day

period.  According to plaintiff's tax records, he earned approximately $600

in 2004, and $5,293 in the following year through December 22, 2005,

from One Source.  Other than working at G&C for two brief periods, and

11

for One Source on a continuing basis, plaintiff has had no other

employment since the time of his accident.

II.     DISCUSSION

    A.     Subject Matter Jurisdiction

From the facts established at trial it appears that there is complete

diversity of citizenship among the parties, plaintiff having at the relevant

times been a resident of New York, and the defendants all being citizens

of Pennsylvania.  Since the matter in controversy exceeds $75,000,

exclusive of interest and costs, this court has subject matter jurisdiction

over plaintiff's claims.  28 U.S.C. § 1332.

    B.     Conflicts of Laws

As an initial threshold matter, the court must determine the

substantive law to be applied in the case.  Plaintiff urges application of

Pennsylvania law, the governing provisions of which are far more

favorable to his cause than their New York counterparts.  Defendants, on

the other hand, though somewhat equivocal in this regard, have urged the

court to consider applying New York law, including its no-fault provisions,

which would prohibit plaintiff's recovery of non-economic damages unless

12

it is found that he suffered a serious injury as a result of the accident.[8]

As a federal court whose subject matter jurisdiction is premised upon diversity of citizenship, the court must apply the choice of law rules of New York, the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97, 61 S. Ct. 1020, 1021-22 (1941); *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006). Under New York law, "[t]he first step in any case presenting a

---

[8]    Plaintiff's complaint, which was originally filed in New York State Supreme Court, Oswego County, alleges, *inter alia*, that plaintiff suffered a serious injury as defined under N.Y. Insurance Law § 5102(d). *See* Complaint (Dkt. No. 1) ¶ 10. Plaintiff's complaint also references the provisions of N.Y. Civil Practice Law and Rules § 1602, which address apportionment of tort liability among persons jointly liable. *Id.* ¶ 11. No reference is made in that complaint to potentially applicable provisions of Pennsylvania law.

In preparation for trial, which was originally scheduled to be conducted before a jury, both parties submitted proposed jury instructions which were based upon New York law. After the matter was assigned to me, I raised the conflicts of law issue during a conference with the parties. At that time, both parties seemingly agreed that Pennsylvania law should apply, given the fact that all three defendants were residents of that state, and the accident occurred there. *See* Dkt. Entry dated 4/21/06.

The choice of law issue is now contested by the parties. Defendant maintains that plaintiff should be estopped from claiming the benefit of Pennsylvania law in view of the allegations set forth in his original complaint, making reference to New York law. For his part, Smith argues that the defendants should be bound by their agreement during the April 21, 2006 conference that Pennsylvania law should apply. I reject both of these positions and find it appropriate to conduct my own conflicts of law analysis to determine which, as between New York and Pennsylvania law, should properly be applied in this case. In this regard, I do not construe plaintiff's complaint as an admission that New York law applies, but rather simply alleging that in the event of such a finding by the court, his injuries nonetheless were sufficient to qualify him for exemption from New York's no-fault restriction on recovery of damages.

potential choice of law issue is to determine whether there is an actual

conflict between the laws of the jurisdiction involved."  *In re Allstate Ins.*

*Co. (Stolarz)*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905 (1993).  A

conflict of law exists "[w]here the applicable law from each jurisdiction

provides different substantive rules[.]"  *Curley v. AMR Corp.,* 153 F.3d 5,

12 (2d Cir. 1998).

Under the provisions of New York's no-fault law, a party injured in a

motor vehicle accident may only commence suit seeking recovery of non-

economic damages if that person has satisfied the "serious injury"

threshold as defined by statute.[9]  N.Y. Ins. Law § 5104(a); *Meyer v.*

*AFGD, Inc.*, 140 F. Supp.2d 179, 182 (N.D.N.Y. 2001) (Kahn, J.).  The

provisions of Pennsylvania's Motor Vehicle Financial Responsibility Law

---

[9]      New York's no-fault law defines "serious injury" as

> a personal injury which results in death; dismemberment;
> significant disfigurement; a fracture; loss of a fetus;
> permanent loss of use of a body organ, member, function
> or system; permanent consequential limitation of use of a
> body organ or member; significant limitation of use of a
> body function or system; or a medically determined injury or
> impairment of a non-permanent nature which prevents the
> injured person from performing substantially all of the
> material acts which constitute such person's usual and
> customary daily activities for not less than ninety days
> during the one hundred eighty days immediately following
> the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

14

("MVFRL"), by contrast, permit such a party to recover non-economic damages without regard to any serious injury threshold provided that that party has not elected the limited tort option available under the MVFRL.[10] 75 Pa. Cons. Stat. § 1705; *Price v. Guy*, 558 Pa. 42, 44, 735 A.2d 668, 670 (1999).  Since the limited tort option was not available to the plaintiff, as a New York domiciliary, the MVFRL does not require proof of a serious injury before non-economic damages can be awarded under Pennsylvania law.

Because it appears that the laws of the two states differ in a material respect, I must next engage in a choice of law analysis.  In New York, such an analysis is informed by one of two distinct sets of principles, depending upon whether the underlying cause of action is one sounding in contract, or instead a tort claim.  *GlobalNet Financial.com, Inc.,* 449 F.3d at 383.

Historically, prior to the court's decision in *Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963), New York's

---

[10]     Under section 1705 of the MVFRL, a person who has selected the limited tort option may seek recovery for all medical and other out-of-pocket expenses, but may not recover for pain and suffering or other non-monetary damages unless he or she has suffered a "serious injury".  Section 1702 of the MVFRL defines a "serious injury" as "[a] personal injury resulting in death, serious impairment of body function or permanent serious disfigurement."

approach to choice of law issues arising in actions implicating tort claims was simply to apply the principle of *lex loci delicti* – meaning the law of the place of the tort – to all substantive issues in the case. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 71-72, 612 N.E.2d 277, 280, 595 N.Y.S.2d 919, 922 (1993).  New York courts have since departed from that hard and fast rule, however, in favor of a more flexible approach giving "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock*, 12 N.Y.2d at 481, 191 N.E.2d at 183, 240 N.Y.S.2d at 749.  Accordingly, New York courts now perform an "interest analysis", when addressing choice of law questions arising in tort actions.  *GlobalNet Financial.com, Inc.*, 449 F.3d at 384. Under that approach, "[t]he law of the jurisdiction having the greatest interest in litigation will be applied[.]"  *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 480 N.E.2d 679, 684, 491 N.Y.S.2d 90, 95 (1985) (internal quotation marks and citation omitted).

Determining which of two competing jurisdictions has the greater interest in having its law applied in a case requires an evaluation of the "'facts or contacts which. . . relate to the purpose of the particular law in

conflict.'" *GlobalNet Financial.com, Inc.*, 449 F.3d at 384 (quoting, *inter alia*, *Schultz*, 65 N.Y.2d at 197, 480 N.E.2d at 684, 491 N.Y.S.2d at 95). This, in turn, requires that the court make two separate inquiries, including to determine "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss." *Padula v. Lilarn Props Corp.*, 84 N.Y.2d 519, 521, 644 N.E.2d 1001, 1002, 620 N.Y.S.2d 310, 311 (1994) (citations omitted).

The first of these two elements is easily applied; when engaged in an interest analysis and attempting to discern and define the state interests at stake, "the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz*, 65 N.Y.2d at 197, 480 N.E.2d at 684, 491 N.Y.S.2d at 95; *see also GlobalNet Financial.com, Inc.*, 449 F.3d at 384. Addressing the second prong of the interest analysis, New York courts have developed two tests, depending upon the nature of the legal principles at issue, and specifically whether they relate to standards of conduct, or instead to allocation of losses resulting from tortious acts. *GlobalNet Financial.com, Inc.,* 449 F.3d at 384-85; *see also Padula*, 84 N.Y.2d at 521-22, 644 N.E.2d at 1002-03, 620 N.Y.S.2d at

311-12.

Conduct-regulating rules are generally designed to have "the prophylactic effect of governing conduct in order to prevent injuries from occurring." *Padula*, 84 N.Y.2d at 522, 644 N.E.2d at 1002, 620 N.Y.S.2d at 311.  It therefore stands to reason that in matters implicating the regulation of conduct, the law of the jurisdiction in which the tort occurred takes on greater significance, and will generally apply.  *GlobalNet Financial.com, Inc.,* 449 F.3d at 384 (citing *Cooney*, 81 N.Y.2d at 72, 612 N.E.2d at 280, 595 N.Y.S.2d at 922).

Where loss-allocating laws are at issue, in contrast, the interests of the jurisdiction in which the tort occurred are less compelling, and in such cases the New York courts accordingly turn to analysis of other factors which bear upon the interests of the competing jurisdictions.  In making that analysis, courts have generally looked to the New York Court of Appeals' decision in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 286 N.E.2d 454, 335 N.Y.S.2d 64 (1972), for guidance.  *See Cooney*, 81 N.Y.2d at 73, 612 N.E.2d at 281, 595 N.Y.S.2d at 923.  In his decision in *Neumeier* Chief Judge Fuld, speaking for the majority, posited three rules which, although laid down in the context of New York's guest statutes, have since

become firmly embedded in New York's choice of law jurisprudence

covering other loss allocation situations as well, *see Cooney*, 81 N.Y.2d at

73, 612 N.E.2d at 281, 595 N.Y.S.2d at 923, noting that

> 1. [w]hen the guest-passenger and the host-driver are domiciled in the same state, and the car is there registered, the law of that state should control and determine the standard of care which the host owes to his guest.
>
> 2. [w]hen the driver's conduct occurred in the state of his domicile and that state does not cast him in liability for that conduct, he should not be held liable by reason of the fact that liability would be imposed by him under the tort law of the state of the victim's domicile.  Conversely, when the guest was injured in the state of his own domicile and its law permits recovery, the driver who has come into that state should not - - in the absence of special circumstances - - be permitted to interpose the law of his state as a defense.
>
> 3. [i]n other situations, when the passenger and the driver are domiciled in different states, the rule is necessarily less categorical.  Normally, the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.

*Neumeier*, 31 N.Y.2d at 128, 286 N.E.2d at 457-58, 335 N.Y.S.2d at 70.

As can be seen, in circumstances implicated by the second and third

*Neumeier* rules the location of the tort takes on particular importance. *See Cooney*, 81 N.Y.2d at 74, 612 N.E.2d at 281, 595 N.Y.S.2d at 923. Under those rules, assuming each state has an equal interest in enforcing its laws, "the situs of the tort is appropriate as a 'tie-breaker' because that is the only State with which both parties have purposefully associated themselves in a significant way." *Id.* (citation omitted).

It is the third *Neumeier* rule which most closely fits the circumstances of this case. That rule creates a presumption that the law of the jurisdiction in which the tort occurred will apply. *Gilbert v. Seton Hall Univ.*, 332 F.3d 105, 109 (2d Cir. 2003). To overcome this presumption, a defendant must show that applying another state's law would "advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *McCann v. Somoza*, 933 F. Supp. 362, 367-68 (S.D.N.Y. 1996). In making such analysis, relevant considerations necessarily include the purposes behind each state's law as well as each state's interest in applying its law. *See Id.* at 366-68.

In this instance Pennsylvania is the site of the tort as well as the domicile of the defendants. Accordingly, Pennsylvania has more than a

minimal connection to the action, and, consequently, more than little interest in seeing its own loss allocation rules apply.  *See Ditondo v. National Rent-A-Fence*, No. 3:03-CV-14, 2004 WL 1242742, at \*1-\*2 (N.D.N.Y. June 3, 2004) (applying North Carolina law, as the place of the accident and domicile of the defendants, in case involving a New York plaintiff).  *Contrast Gilbert*, 332 F.3d at 109-10 (where a state's only connection to the litigation is that the tort occurred there the state is said to have "at best" a minimal interest in seeing its own loss allocation rules applied); *see also Sheldon v. PHH Corp.*, 135 F.3d 848, 854-55 (2d Cir. 1998) (rejecting application of Michigan law, whose only connection to the litigation was that the accident occurred there, in favor of New York law which had an interest in ensuring recovery for its domiciliary and avoiding burdensome liability for a company which did business within its borders).

Having carefully weighed the interests of Pennsylvania and New York, informed by New York's choice of law principles applicable in tort cases involving loss allocation statutes, I find that the interests of New York are not sufficiently strong to overcome the presumption that Pennsylvania law should control in this case.  *See Ditondo*, 2004 WL 1242742, at \*2.

C.    Exclusion of Expert Testimony

In their trial brief, defendants have asked the court to exclude opinion testimony offered at trial by Dr. Eng, plaintiff's treating neurosurgeon.  The basis for defendants' motion, which is heavily dependent upon legal principles applicable to admission of expert testimony in New York, is their view that Dr. Eng's opinions hinge upon the findings of a physical therapist who is not authorized under New York law to make diagnoses or render opinions of the type set forth in the therapist's FCE.

The admission of expert testimony in an action pending in federal court is governed by rule which provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  When applying this standard to expert testimony proffered by a party, trial courts are required by Supreme Court dictate to

22

perform a "gatekeeping" function to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993).

As a threshold matter, a trial court must obviously examine the question of whether the proffered opinion evidence can satisfy Rule 401 of the Federal Rules of Evidence, requiring that evidence offered at trial be relevant to a controverted claim or defense in the case. *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). If the requisite degree of relevance is found, the court must then proceed to determine whether the expert opinion sought to be admitted has a sufficiently reliable foundation to allow consideration by the factfinder. *Id.* at 265-66. This latter inquiry requires consideration of various relevant factors identified in Rule 702, including whether

> (1) . . . the testimony is grounded on sufficient facts or data; (2) . . . the testimony "is the product of reliable principles and methods"; and (3) . . . "the witness has applied the principles and methods reliably to the facts of the case."

*Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). While both Rule 702 and the Supreme Court's decisions in *Daubert*, and later in

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999),

identify factors bearing on the question of reliability, courts have stressed

that "the *Daubert* inquiry is fluid and will necessarily vary from case to

case." *Amorgianos*, 303 F.3d at 266.

Before I proceed to engage in the required analysis, two additional

considerations should be stated.  First, Rule 702 does not require

rejection of opinions based solely upon the court's disagreement with the

conclusions reached or the correctness of the opinions to be offered.

*Amorgianos*, 303 F.3d at 266 (citing *Daubert*, 509 U.S. at 595, 113 S. Ct.

at 2797).  Secondly, although the burden of establishing admissibility in

the first instance rests with the proponent of the expert testimony in

question, any doubts on the part of the court should be resolved in favor

of admissibility.  *See Colon ex rel. Molena v. BIC USA, Inc.*, 199 F. Supp.

2d 53, 75 (S.D.N.Y. 2001).

At the heart of defendants' motion is the question of whether, in

relying in part for his opinions regarding plaintiff's limitations upon a

functional capacity evaluation of a physical therapist offering observations

regarding the plaintiff's physical abilities and limitations, Dr. Eng deviated

from the Rule 702 standard and acted unreasonably and not in reliance

upon the type of data typically accepted by others practicing in his field.

While, as defendants assert, plaintiff's physical therapist may not be

legally permitted or competent under New York law to render specific

diagnoses, her observations regarding plaintiff's physical limitations,

based upon her care and treatment of Smith, may well bear sufficient

indicia of reliability to form a part of the foundation for the opinions of

plaintiff's treating neurosurgeon.  I note that under somewhat analogous

circumstances several courts have permitted chiropractors to testify,

pursuant to Rule 702, to the effects of injuries sustained by parties,

particularly to the back or neck areas.  *See Hodder v. United States*, 328

F. Supp. 2d 335, 346-47 (E.D.N.Y. 2004) (collecting cases).  Whether

these cases can be extrapolated to extend to physical therapists and

permit them to give opinion testimony regarding physical limitations is

perhaps an open question.  Even if they cannot, however, it does not

necessarily follow that the observations of a treating physical therapist

may not be included among the clinical findings and data relied upon by a

treating physician opining upon the consideration of his or her patient.[11]

---

[11]    I note that defendants' own expert, Dr. David Storrs, testified that in his practice he relies upon FCEs, among other relevant and available data, to support his opinions regarding medical conditions.

Were it the case that Dr. Eng's opinions were based solely upon the FCE analysis completed by plaintiff's treating physical therapist, and not upon Dr. Eng's own experiences with the plaintiff, including several in-office examinations; review of EMG, neural condition, MRI and CT testing, as well as x-rays; and having performed surgery on the plaintiff, one could perhaps argue, as defendants have, a lack of reliability, particularly in view of the fact that Dr. Eng was not asked to testify as to whether the FCE report was the type of data reasonably relied upon by professionals in his field of practice.[12]  Because the bases for Dr. Eng's opinions include his own observations and other data beyond merely the therapist's FCE, however, I find that his testimony falls comfortably within Rule 702 in light of his personal observations and experiences with the plaintiff.

---

[12]     Even under such circumstances I would be disinclined to grant defendants' motion in light of its manifest unfairness.  The scheduling order in this case required that all pretrial filings be filed with the court on or before March 1, 2006. *See* Dkt. Entry dated February 15, 2006.  Defendants' motion, which has been treated by the court as seeking relief *in limine*, was filed on June 9, 2006, well after that deadline date and in fact on the last business day before the commencement of trial. Dr. Eng's testimony was presented by videotape of a deposition which was taken on June 7, 2006.  Had plaintiff's counsel had the benefit of defendants' argument prior to taking Dr. Eng's deposition he could, and surely would, have attempted to elicit information as to whether the FCE relied upon Dr. Eng was the type of data upon which others in his field would typically rely, and quite likely could have satisfied the threshold requirements of Rule 702 and *Daubert*/*Kumho Tire*.  In light of the manifest unfairness which would result from a favorable ruling on defendants' motion, I would deny this application to strike Dr. Eng's testimony on this basis, even if it contained palpable merit

Accordingly, defendants' motion to strike testimony of Dr. Eng will be denied.

### D.   Liability

In their submissions to the court, and at trial, defendants have conceded liability for negligence.  Accordingly, I find that defendants are liable to the plaintiff for any damages legally recoverable and proximately caused by their negligent acts.

### E.   Damages

Under Pennsylvania law, a plaintiff who is not restricted by the limited tort option may recover all damages, economic and otherwise, which proximately result from defendants' negligence.  *Bennett v. Mucci*, No. 1103 MDA 2005, 2006 WL 1529695, at *2 (Pa. Super. Ct. June 6, 2006) (citing 75 Pa. Cons. Stat. § 1705).  In this instance plaintiff's recovery may include, without monetary limitation, damages for pain and suffering as well as for economic loss.  75 Pa. Cons. Stat. § 1705(c).

#### 1.   Pain and Suffering

Plaintiff's pain and suffering damage claim is comprised of two elements.  Initially, plaintiff seeks recovery of damages associated with the pain and suffering experienced immediately following his accident, and

leading up to and including that necessitating his surgery in January of 2004.  Additionally, in reliance upon Dr. Eng's conclusion that he suffers from a permanent condition which results in both a limitation of mobility and ongoing pain and numbness, plaintiff seeks recovery of damages for this additional element of pain and suffering, both since recovery from his surgery in January of 2004 and extending into the future.

Although it is undisputed that plaintiff suffered from a bone spur which clearly predated the June, 2003 accident, and surgery of the nature undergone by Smith in January of 2004 could eventually have been necessitated even had he not been involved in the accident, I credit Dr. Eng's conclusion that the trauma associated with the June, 2003 incident triggered plaintiff's pain and numbness leading up to and requiring the operation.  I therefore find that plaintiff is entitled to recover damages for pain and suffering associated with that period between June 18, 2003 and the end of the recuperative period for his surgery, in the amount of $50,000.

I do not, however, fully credit the testimony of Dr. Eng and plaintiff's subjective statements regarding pain and suffering extending beyond the date of the surgery.  Notably, over much of the time in question plaintiff

did not request prescription pain medication, instead self treating his

condition with Ibuprofen and similar analgesic, over-the-counter

medication.  Results of EMG and nerve conduction testing of the plaintiff

were largely unremarkable.  And, while Dr. Eng recommended additional

MRI and EMG studies, plaintiff opted not to undergo the second round of

testing.  Plaintiff's pain complaints, then, are wholly subjective without any

objective evidence to corroborate that following surgery he continued to

suffer from a condition which could be expected to generate pain and

numbness to the degree which he claims to experience.[13]  Based upon

the court's observations, a careful review of plaintiff's medical records,

and the fact of his employment – oftentimes for lengthy periods – I find

plaintiff's complaints regarding the degree of ongoing, debilitating pain

and numbness are exaggerated, and not fully credible.[14]  While plaintiff

does appear to suffer from residual pain to his left shoulder and extending

---

[13]     Under New York law, when measuring an injury such as that experienced by the plaintiff against the serious injury gateway threshold, the courts treat limitations in mobility as falling within the realm of the subjective, rather than the objective.  *See*, *e.g.*, *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 355-58, 774 N.E.2d 1197, 1203-05, 746 N.Y.S.2d 865, 871-73 (2002).  There is no indication that the law of Pennsylvania would regard such evidence differently.

[14]     Plaintiff's credibility was seriously called into question by evidence that on more than one occasion he reported that he was not working when, in fact, he was employed with One Source.

down into his hand, I find that it is relatively minimal and in any event not disabling to the extent claimed by him.  Accordingly, I will award the sum of $25,000 to compensate plaintiff for past and future pain and suffering experienced by the plaintiff following recovery from his surgery.

### 2.    Economic Loss

Plaintiff's economic loss claim is supported by the testimony of Dr. Kenneth Reagles, a vocational specialist, and Dr. William Blanchfield, a forensic economist.  With Dr. Eng's testimony regarding plaintiff's limitations, which has as its lynchpin the light duty FCE prepared by plaintiff's physical therapist, Dr. Reagles opined that plaintiff is unable to perform even in a sedentary employment position, such as a security guard monitoring closed circuit television screens, or as a telemarketer. Dr. Reagles attributed this inability to both plaintiff's limitations and the difficulties faced by a disabled person entering a competitive workplace setting.  Utilizing that opinion, coupled with plaintiff's earnings at G&C foods and his reduced earning power as demonstrated by the wages paid to him by One Source, Dr. Blanchfield opined that over his anticipated working life, assuming that he chose to work until age sixty-five, plaintiff would suffer a diminution in earning capacity and fringe benefits in the

amount of nearly $1.8 million.[15]

At the trial plaintiff failed to establish, to my satisfaction, that he is unable to work in a full time position.  Indeed, his work at One Source, oftentimes extending for prolonged periods, belies this contention.  In addition, the limitations assumed by Dr. Reagles are inconsistent with plaintiff's conservative course of treatment, as well as his inability or unwillingness to submit to further testing in order to assist in the diagnosis of his condition.  In the end, like a house of cards, the opinions leading to the economic damage figure rise and fall upon plaintiff's subjective complaints and the FCE report of plaintiff's physical therapist, completed in September of 2004, and not upon any independent testing or objective findings by Dr. Eng or any other medical professional.  The FCC report is both extremely outdated, and not supportive of plaintiff's inability to work in any capacity, as assumed by Dr. Reagles.  Plaintiff's subjective complaints, I have already found, are exaggerated and not fully credible.  For these reasons, I find that plaintiff has not proven by a preponderance of the evidence that he is unable to work as a truck driver, or in any other available full time position earning comparable wages.  Accordingly,

---

[15]     Remarkably, Dr. Blanchfield did not calculate the present value of that lost income stream, even though it would extend for several years into the future.

plaintiff has not carried his burden of establishing that as a result of defendants' negligence he has suffered from a diminution of his earning capacity.  I therefore decline to award damages for future economic loss.

I do find, however, that due to his accident plaintiff was unable to work in his position as a truck driver until after recovering from his surgery.  I therefore award past economic losses, based upon plaintiff's average gross weekly pay of $827.60, calculated over the ten weeks prior to the date of plaintiff's accident, and adding twenty percent to that figure to compensate him for lost fringe benefits, in the total amount of $69,109.32 covering the period from June 18, 2003 until he was cleared by Dr. Eng to return to work on November 15, 2004, and excluding amounts earned during that period, plus twenty percent, from G&C.

### 3.    Unpaid Medical Expenses

At the close of proof the parties stipulated that as a result of the accident and the ensuing treatment for his neck injury, plaintiff incurred medical expenses in the amount of $26,203.87.  Since those damages are not controverted and were proximately related to defendants' negligent acts, I will therefore award that sum as part of plaintiff's recovery.

IV.   <u>SUMMARY AND ORDER</u>

Having applied Pennsylvania law and concluded, based upon their admission, that defendants are liable to the plaintiff in negligence, I find that plaintiff is entitled to recover damages for past and future pain and suffering, in the total amount of $75,000.00, past lost wages in the amount of $69,109.32, and medical expenses of $26,203.87, for a total amount of $170,313.19, but that he is not entitled to recover future economic loss based upon a diminution in his earning capacity.  It is therefore

ORDERED, that judgment be entered in plaintiff's favor awarding him the sum of $170,313.19 against the defendants, jointly and severally.

Dated:      July 17, 2006
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\trial\trials\smith\dec&order.wpd

33